AO 91 (Rev. 11/11)   Criminal Complaint

# UNITED STATES DISTRICT COURT

for the

Central District of California

| | | |
|---|---|---|
| United States of America | ) | FILED<br>CLERK, U.S. DISTRICT COURT<br><br>DEC – 7 2018<br><br>CENTRAL DISTRICT OF CALIFORNIA<br>BY _____ DEPUTY |
| v. | ) | |
| Robin DiMaggio | ) | Case No. |
| | ) | |
| | ) | MJ 18 - 3240 |
| | ) | |
| *Defendant(s)* | ) | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____ May 2016 to the Present _____ in the county of _____ Los Angeles _____ in the

_____ Central _____ District of _____ California _____, the defendant(s) violated:

| *Code Section* | *Offense Description* |
|---|---|
| Title 18, United States code, Section 1343 (Wire Fraud) | See Attachment |

This criminal complaint is based on these facts:

(See attached affidavit which is incorporated as part of this Complaint.)

☑ Continued on the attached sheet.

_____
*Complainant's signature*

Special Agent Rob Chowthi
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _____ 12/07/2018 _____

**CHARLES F. EICK**
*Judge's signature*

City and state: _____ Los Angeles, California _____

Honorable Charles Eick
*Printed name and title*

**Attachment**

Beginning in or around May 2016 and continuing to the present, DIMAGGIO, knowingly and with intent to defraud, devised, participated in, and executed a scheme to defraud K.D. as to material matters and to obtain money and property from K.D. by means of material false and fraudulent pretenses, representations, and promises, and the concealment of material facts.  For the purpose of executing this scheme and in an essential part of the scheme, on or about August 5, 2016, in Los Angeles County, within the Central District of California, and elsewhere, defendant DIMAGGIO, transmitted and caused the transmission of a wire communication in interstate and foreign commerce of approximately $750,000 from a bank account in the name of K.D.'s company in Bulgaria to an account controlled by DIMAGGIO, the DMI Citibank Account, in the Central District of California.

**AFFIDAVIT**

I, Robert Chowthi, being duly sworn, declare and state as follows:

## INTRODUCTION

1.    I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been so employed since March 2017.  I am currently assigned to a Los Angeles Field Division White Collar Crimes Squad, which is responsible for investigating financial institution fraud, including bank fraud and wire fraud.  Prior to being employed by the FBI as a Special Agent, I was employed by Bank of America as a financial crimes auditor for five years, ensuring that processes and controls were in place to prevent fraud and money laundering.

2.    Since becoming an FBI Special Agent in 2017, I have received 21 weeks of formal training at the FBI Training Academy in Quantico, Virginia.  During the time I have been employed by the FBI, I have participated in investigations relating to wire fraud, mail fraud, and various types of financial institution fraud.  I have participated in many aspects of criminal investigations to include; reviewing evidence, analyzing financial documents, conducting physical and electronic surveillance, working with informants, and executing search and arrest warrants.  Additionally, I have interviewed victims who had personal knowledge regarding the investigation in which I have been involved.

## PURPOSE OF AFFIDAVIT

3.    This affidavit is made in support of a criminal complaint and arrest warrant for ROBIN DIMAGGIO ("DIMAGGIO") for a violation of Title 18, United States Code, Section 1343 (Wire Fraud).

4.    In addition, this affidavit is made in support of a search warrant for information associated with the email account identified as thedimaggio@gmail.com ("DIMAGGIO EMAIL ACCOUNT"), that is stored at the premises controlled by Google, LLC ("the Provider"), a provider of electronic communication and remote computing services, headquartered at 1600 Amphitheatre Parkway, Mountain View, California, 94043.[1] The information to be searched is further described in Attachment A.   This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), 2703(c)(1)(A) and 2703(d)[2]

---

[1] Because this Court has jurisdiction over the offense(s) being investigated, it may issue the warrant to compel the PROVIDER pursuant to 18 U.S.C. §§ 2703(a), (b)(1)(A), (c)(1)(A). See 18 U.S.C. §§ 2703(a) ("A governmental entity may require the disclosure by a provider . . . pursuant to a warrant issued using the procedures described in the Federal Rules of Criminal Procedure . . . by a court of competent jurisdiction") and 2711 ("the term 'court of competent jurisdiction' includes -- (A) any district court of the United States (including a magistrate judge of such a court) or any United States court of appeals that -- (i) has jurisdiction over the offense being investigated; (ii) is in or for a district in which the provider of a wire or electronic communication service is located or in which the wire or electronic communications, records, or other information are stored; or (iii) is acting on a request for foreign assistance pursuant to section 3512 of this title").

[2] The government is seeking non-content records pursuant to 18 U.S.C. § 2703(d).   To obtain the basic subscriber information, which do not contain content, the government needs only a subpoena.   See 18 U.S.C. § 2703(c)(1), (c)(2).   To obtain

to require the PROVIDER to disclose to the government copies of the information (including the content of communications) described in Section II of Attachment B.  Upon receipt of the information described in Section II of Attachment B, law enforcement agents and/or individuals assisting law enforcement and acting at their direction will review that information to locate the items described in Section III of Attachment B. Attachments A and B are incorporated herein by reference.

    5.    As described more fully below, I respectfully submit there is probable cause to believe that the information associated with the DIMAGGIO EMAIL ACCOUNT constitutes evidence, contraband, fruits, or instrumentalities of criminal violations of Title 18, United States Code, Section 1343 (Wire Fraud), Title 18, United States Code, Section 1028A (Aggravated Identity Theft), and Title 18, United States Code, Section 1957 (Transactions in Criminally-Derived Proceeds).

    6.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and

---

additional records and other information--but not content--
pertaining to subscribers of an electronic communications
service or remote computing service, the government must comply
with the dictates of section 2703(c)(1)(B), which requires the
government to supply specific and articulable facts showing that
there are reasonable grounds to believe that the records or
other information sought are relevant and material to an ongoing
criminal investigation in order to obtain an order pursuant to
18 U.S.C. § 2703(d).  The requested warrant calls for both
records containing content (see Attachment B paragraph II.13.a)
as well as subscriber records and other records and information
that do not contain content (see Attachment B paragraph
II.13.b).

witnesses.  This affidavit is intended to show merely that there
is sufficient probable cause for the requested complaint, arrest
warrant and search warrant and does not purport to set forth all
of my knowledge of or investigation into this matter.  Unless
specifically indicated otherwise, all conversations and
statements described in this affidavit are related in substance
and in part only.

### SUMMARY OF PROBABLE CAUSE

7.   As set forth in further detail below and based on the
information that I have obtained during the course of this
investigation and my training and experience, I have learned
that, between at least approximately May 2016 and the present,
DIMAGGIO represented that he would assist the Peace For You
Peace For Me Foundation (the "Foundation"), a nonprofit
organization registered under the laws of Bulgaria, with
organizing a charity concert designed to raise money for and
awareness of homeless and displaced children from conflict zones
worldwide.  During the course of discussions between the
Foundation and DIMAGGIO, DIMAGGIO made material false
representations that caused the Foundation's financial sponsor,
K.D., to wire him funds.  Specifically, on or about August 5,
2016, K.D. wired $750,000 to an account controlled by DIMAGGIO
from an account in the name of a company run by K.D.  Prior to
that transfer, defendant represented that he would not spend the
money and that, by August 10, 2016, the entirety of the funds
would be placed in an escrow account.  In truth and in fact,
defendant withdrew the funds on or about August 9, 2016 and

4

subsequently used the funds to, among other things, purchase a home for his ex-wife in Calabasas, California.

STATEMENT OF PROBABLE CAUSE

**A.   Background on DIMAGGIO**

8.   Based on my review of incorporation records, I know that DiMaggio International, Inc. ("DMI") was incorporated on or about September 1, 2006 by DIMAGGIO.  According to Statements of Information filed with the California Secretary of State in 2009 and 2014, DIMAGGIO was the CEO, Secretary, CFO, and sole director of DMI.  The Statements of Information for both 2009 and 2014 listed the addresses of DMI's principal offices in those years as being located in Agoura Hills, California. According to the California Secretary of State, DMI is currently suspended.

9.   Based on interviews with witnesses and records that I have obtained, I know that DIMAGGIO resided and/or conducted business in Agoura Hills, during a portion of the relevant time period.

10.   Based on documents received from the Foundation, I know DIMAGGIO used the DIMAGGIO EMAIL ACCOUNT to communicate with the Foundation and associated individuals.  Based on my review of subscriber records, I know that the subscriber listed for the DIMAGGIO EMAIL ACCOUNT is "R. DiMaggio" and the account was created in or around February 12, 2009.

11.   As set forth in greater detail below, based on my review of a deposition transcript during the course of civil litigation between the Foundation and DIMAGGIO, I understand

5

DIMAGGIO has claimed that the vast majority of emails sent by
the DIMAGGIO EMAIL ACCOUNT to the Foundation and associated
individuals were actually sent by another individual, B.S.

     12.   However, I believe DIMAGGIO was the user of the
DIMAGGIO EMAIL ACCOUNT and sent and/or was aware of the emails
sent to the Foundation and associated individuals.  I base this
belief on a series of facts, including, but not limited to the
following, which are discussed in greater detail herein: (1) the
subscriber for the DIMAGGIO EMAIL ACCOUNT is DIMAGGIO;
(2) interviews with individuals associated with the Foundation
and its financial sponsor who stated that they never met or
spoke by telephone with B.S. and that they understood, based on
the email correspondence and contemporaneous telephone calls,
they were exchanging emails with DIMAGGIO; (3) an interview with
a well-known musician who was contacted by DIMAGGIO in
connection with this concert who confirmed that he used the
DIMAGGIO EMAIL ACCOUNT to communicate with DIMAGGIO; and (4) the
funds requested in the emails sent from the DIMAGGIO EMAIL
ACCOUNT  were sent to bank accounts linked to DIMAGGIO and used
to pay for expenses related to DIMAGGIO and his family.

     **B.   DIMAGGIO Embezzled At Least $750,000 Transferred By
           K.D. In Connection with the Charity Concert**

           1.   Background on Charity Concert

     13.   On November 29, 2018, I interviewed by telephone A.P.,
an individual who works for K.D., the financial sponsor of the
Foundation.  In addition, I have reviewed an FBI report of a
telephonic interview of J.B., a founding member of the

Foundation, which was also conducted on November 29, 2018.
Based on these interviews, I learned the following:

      a.   J.B. was the founding member of the Foundation.
For approximately 30 years, J.B. has worked in theater and the
arts.  More recently, J.B. has promoted concerts abroad.

      b.   In or around June 2016, K.D., a resident of
Sofia, Bulgaria, decided to invest in the charity concert the
Foundation was attempting to organize.  The charity concert was
to raise money for and awareness of homeless and displaced
children from conflict zones worldwide.  The charity concert was
to be held in Sofia, Bulgaria on October 1, 2016.  The concert
was to be modeled off of the Live-Aid concert in 1985.  K.D.
provided financial support for the Foundation.

      c.   A.P. works for K.D.'s company.  A.P. has worked
for K.D. since in or around 2006, and had never attempted to
organize a concert event prior to the Foundation's proposed
charity concert. A.P. was tasked by K.D. to oversee the usage of
K.D.'s funds and review agreements related to the concert.

      d.   In or around May 2016, the Foundation was
introduced to DIMAGGIO through an intermediary.  J.B. was told
by the intermediary that DIMAGGIO was a well-known drummer and
the "Musical Director of the United Nations" at one time.
DIMAGGIO represented that he would be able to get several
celebrities to perform at the charity concert.

      e.   J.B. met with DIMAGGIO in May 2016 in Bulgaria at
a press conference related to the concert.

   f.   J.B. communicated with DIMAGGIO in a variety of ways including by telephone, Whatsapp, a program similar to Skype called Viber, and email.  The majority of communications between DIMAGGIO and A.P., J.B., and others associated with the Foundation occurred over email.  During these communications, DIMAGGIO used the DIMAGGIO EMAIL ACCOUNT.

   g.   At no time did J.B. speak by telephone or meet in person with B.S.[3]

   h.   J.B. understood that DIMAGGIO's role was to secure artists for the charity concert.  DIMAGGIO called J.B. by telephone and discussed the artists he had managed to secure for the concert.  Based on my review of the emails discussed below, I know that the emails sent by the DIMAGGIO EMAIL ACCOUNT concerned some of the same artists that J.B. stated DIMAGGIO would discuss with him by telephone.

   i.   During the course of the relationship, K.D. made a transfer of $750,000 on behalf of the Foundation based on DIMAGGIO's representations that the funds would be used to pay to secure artists for the charity concert and that the funds would be kept in an escrow account.

_____

   [3] Based on my review of emails between DIMAGGIO and the Foundation, I understand DIMAGGIO initially stated he intended to work with B.S. on the charity concert, that B.S. was copied on some emails early on, and that the contract engaging DIMAGGIO initially bore the name of AEI Entertainment, an entity connected to B.S.  However, thereafter AEI Entertainment was replaced with DMI.

j.    On or about August 10, 2016, DIMAGGIO told the Foundation that the artists' managers believed the charity concert should be postponed.

k.    Thereafter, the Foundation asked for the funds to be returned and to date, the Foundation has not received any funds from DIMAGGIO.

2.    Defendant Represents $750,000 in Funds Will Be Held in Escrow

14.    Based on my review of bank records obtained from Citibank, and information learned from interviews with A.P. and J.B., I have learned that, on or about August 5, 2016, K.D.'s company wired $750,000 from its bank account in Bulgaria to a bank account held at Citibank in the name of DMI ("DMI Citibank Account"). DIMAGGIO is the sole signatory on the DMI Citibank Account. The DMI Citibank Account was located in Westlake Village, California.

15.    Based on my review of emails produced to the government by the Foundation, I have learned the following:

a.    On July 25, 2016, J.B. emailed DIMAGGIO, at the DIMAGGIO EMAIL ACCOUNT, and stated "Hi Robin, It's great that you are starting to approach other artists. Please, let us know which names do you have in mind, before starting the actual approach." In response, DIMAGGIO, using the DIMAGGIO EMAIL ACCOUNT, stated that several well-known artists were being approached today. Later in that email chain, DIMAGGIO stated that D.F., a well-known rock musician, "said Yes . . . and will

9

sign the contract but he just went from 100k to 200 because of the bad criminal press .he is ready to sign today."

b.   After a series of emails about artists and a series of contract negotiations, DIMAGGIO, using the DIMAGGIO EMAIL ACCOUNT, sent an email to A.P. on August 4, 2016, enclosing an agreement between DMI and K.D. (the "DMI Agreement") signed on behalf of DMI.  The DMI Agreement set forth that K.D. represented the Foundation and that DMI was to assist in procuring the performance of certain artists at the charity concerts.  As part of the agreement, K.D. was to transfer $750,000 into an escrow account for DMI "as a Guarantee for future payments related to Artists engaged with participation in the Event."  The Artists that DMI was to "engage" for the charity concert included well-known singers and musicians, including but not limited to, D.F.  The contract specifically stated that the pertinent email address for DMI was the DIMAGGIO EMAIL ACCOUNT.

c.   On the same day, August 4, 2016, A.P. sent an email back to DIMAGGIO at the DIMAGGIO EMAIL ACCOUNT, attaching a copy of the contract countersigned by K.D..  In the email, A.P. stated that they were "waiting the [sic] Escrow account details and the Escrow agreement as stated in paragraph 7."  Paragraph 7 of the contract stated that K.D. was to transfer the funds to DMI five days after receiving the escrow agreement.

d.   On August 4, 2016, DIMAGGIO, using the DIMAGGIO EMAIL ACCOUNT, responded stating "Send to my Account DiMaggio

int.  For right now time is about to be against if i dont [sic]
show proof."

       e.  Hours later, on August 4, 2016, DIMAGGIO, using
the DIMAGGIO EMAIL ACCOUNT, sent an email to A.P. and K.D.
stating that he could not "create a new escrow account until i
return back to the states August 10th."  A.P. stated in response
"Ordered by [K.D.] we will pay if you explicitly confirm that we
will have the Escrow clause and papers strictly respected
immediately at your return 10th.  Show the money and do not
spend it until the money land in Escrow account."  In response,
DIMAGGIO, using the DIMAGGIO EMAIL ACCOUNT, stated "I agree to
both terms explicitly, However it takes up to 24 hours for the
escrow account to be open so give me till the 12th, to be safe.
Send wire confirmation so i can show the Managers this is real."
K.D. later stated "Dear Robin ,if [sic] you agree immediately
after your return to LA to fulfill the conditions ,stipulated
[sic] in the contract between us, tomorrow , Friday , your
account will be credited with the requested amount of $750,000."
In response, DIMAGGIO, using the DIMAGGIO EMAIL ACCOUNT, stated
"I agree 100% Confirmed.  We are all here to win, and make sure
we have a concert that makes a loud noise in the Baltics and
further more around the world. So yes You have my Word."

       f.  On August 5, 2016, A.P. wrote to DIMAGGIO at the
DIMAGGIO EMAIL ACCOUNT stating "Robin, Today you will have the
money as agreed.  Please send back the attached Amendment signed
and dated by you asap."  In response, DIMAGGIO, using the
DIMAGGIO EMAIL ACCOUNT, sent an email to A.P. and K.D. stating

"Thank you Alex, I will amend this within the next few days or latest by the 10th and also will open Escrow by 12th ready to operate.  Lastly please send wire info and i will tell my bank to keeo [sic] an eye on it and will let you know as soon as it hits my account."  In response, A.P. asks for the amendment to be signed and scanned "now."  DIMAGGIO, using the DIMAGGIO EMAIL ACCOUNT, then replied that he could not because he was "in the middle of Tasmania, there is [sic] no scanners."

16.  Based on my review of law enforcement databases, I have learned that DIMAGGIO returned to Los Angeles from Australia on August 9, 2016.

17.  Based on my interview with A.P., I have learned that A.P. and K.D. understood that the $750,000 would be placed in an escrow account and, after further discussions between the Foundation and DIMAGGIO, these funds would be used to pay fees to the artists who would perform at the concert.  A.P. stated that he and K.D. were insistent that the funds be placed in an escrow account.

        3.    <u>DIMAGGIO Failed to Set Up Escrow Account and Used K.D.'s Funds to Support His Lifestyle and Purchase a Home for his Ex-Wife</u>

18.  Based on my review of Citibank records, I have learned that, prior to receipt of the $750,000 wire from K.D.'s company, the balance in the DMI Citibank Account was $36.89.  Four days after receiving $750,000 from K.D., on August 9, 2016, $750,000 was withdrawn from the DMI Citibank Account.  The DMI Citibank Account was later closed on September 12, 2016.

19.   Based on my review of Citibank[4] records, I have learned
that, on August 9, 2016, the same day that $750,000 was
withdrawn from the DMI Citibank Account, $750,000 was deposited
into a bank account at Citibank in the name of DIMAGGIO
("DIMAGGIO Citibank Account").  DIMAGGIO is the sole signatory
on the DIMAGGIO Citibank Account.  The balance of the DIMAGGIO
Citibank Account immediately prior to the $750,000 deposit was
$2,697.25.

20.   Based on my review of DIMAGGIO Citibank Account, I
have learned that, after the deposit of $750,000, the DIMAGGIO
Citibank Account had the following transactions:

a.   On August 9, 2016, three cashier checks were
purchased.  Two of the three cashier checks were for $7,500
each; both made payable to [B.S.] XZ.  The third cashier check
was for $30,000 and made payable to AEI Ent. Brokerage.  I
understand AEI to be an entity associated with B.S.

b.   On August 10, 2016, a cashier's check was
purchased for $35,209 and made payable to Volvo cars.  On August
11, 2016, a cashier's check was purchased for $24,000 and made
payable to Shaver Automotive, which I understand from publicly-
available information is a car dealership in Thousand Oaks,
California.  On August 12, 2016, a cashier's check was purchased
for $32,000 and made payable to E.D., who I understand, based on
my review of escrow records, was the real estate agent for the

---

[4] To date Citibank has not yet provided copies of checks for
any of the Citibank records. On August 19, 2016 a $17,900 check
was negotiated. The other checks in August were less than
$2,000. I did not identify any checks in September.

purchase of the home referred to in paragraph 19(c).  On August
16, 2016, a cashier's check was purchased for $3,380 and made
payable to US Treasury Internal Revenue Service.  The check
referenced a number that appears to be DIMAGGIO's social
security number.  On August 18, 2016, four cashier's checks were
purchased, totaling $5,896.00.  Each check was made payable to
Calabasas Village, which appears to relate to living expenses.

      c.   On or about August 22, 2016, $251,370 was
transferred out of the DIMAGGIO Citibank Account.  Based on my
review of escrow records, I have learned that these funds were
used to purchase a real property located in Calabasas,
California.  The buyer listed on this sale was DIMAGGIO's ex-
wife.  Based on my review of the transcript of DIMAGGIO's
deposition taken during civil litigation with K.D., I have
learned that DIMAGGIO admitted to purchasing the home in
Calabasas, California for his ex-wife.

      d.   Between August 15, 2018 and August 26, 2018, at
least $15,058.44 in payments were made to credit cards.

      e.   Between August 10, 2016 and August 31, 2016 debit
card transactions totaled approximately $53,622.91 and cash
withdrawals totaled approximately $37,979.

      f.   On August 16, 2016, $150,000 was transferred to a
Citibank account in the name of DiMagic Entertainment, Inc.
("DiMagic Citibank Account").  Based on my review of records
from Citibank, DIMAGGIO was the only listed signatory on that
account.  The transferred funds were co-mingled with other
deposits.  The funds in the DiMagic Citibank Account were spent

down over several months.  On June 30, 2017, the balance in the account was $3,025.33.  I did not identify any payments to any performers that readily appeared to be related to the event organized by the Foundation out of the DiMagic Citibank Account, and the spending activity in the DiMagic Citibank Account seems to be very similar to that of the DIMAGGIO Citibank Account.

21.  Based on my review of bank records for the DMI Citibank Account and the DIMAGGIO Citibank Account, I have not seen any transfers that readily appeared to be sent to artists or their management in connection with the charity concert in Bulgaria.

4.  <u>DIMAGGIO Postponed Charity Concert and Failed to Return Funds As Promised</u>

22.  Based on my review of emails produced to the government by the Foundation, I have learned:

a.  On August 10, 2016, DIMAGGIO, using the DIMAGGIO EMAIL ACCOUNT, sent an email to K.D. stating that "an entire group of managers" believed the concert should be postponed to December 1, 2016.  DIMAGGIO stated that he agreed with these managers.  K.D. then forwarded the email to A.P.  In response, A.P. told DIMAGGIO that K.D. was "surprised" because in December the temperatures in Bulgaria were very low and there could be snow.  A.P. stated that "[n]evertheless in case you think that for you is impossible to manage as planned, say so and let the money back."

b.  On August 16, 2016, DIMAGGIO, using the DIMAGGIO EMAIL ACCOUNT, sent an email to K.D. stating that the artists'

managers believed K.D.'s associates were "idiots" for insisting the show proceed on October 1.  K.D. then forwarded the email to A.P. who responded to DIMAGGIO.  A.P. wrote: "Dear Robin, I can recall all the handicaps you faced for the last month: you can't see the money, short term, inability to sign, broken phone, trips, managers disagreement, brokers fired etc., etc.  Just for the record:  still no Amendment despite you [sic] promise; still no escrow account despite of the agreement and your promise; still no artist engaged despite of your promise and despite all that money we sent you.  Ok, now is clear that it is impossible for you to respect agreements and your own promises.  **Please wire all the money back immediately.**"  In response, DIMAGGIO stated "Send wire info."  A.P. told DIMAGGIO he had the wire information already, but that if he needed something more particular he should "specify."  DIMAGGIO wrote "As soon as everyone returns the deposits.  I will forward to your swift[.]"

      c.    On or about September 2, 2016, A.P. sent another email to DIMAGGIO, at the DIMAGGIO EMAIL ACCOUNT, asking for the return of all funds.  In response, DIMAGGIO wrote, from the DIMAGGIO EMAIL ACCOUNT, that he "sent deposits to Artists as agrees[sic]."

    23. On November 28, 2018 the FBI interviewed D.F. I reviewed a report of the interview and learned that:

      a.    D.F. has known DIMAGGIO for five or six years.

      b.    D.F. and DIMAGGIO have worked together periodically during the relevant time period on recording records and at an event at which D.F. performed.

c.   Everything that D.F. and DIMAGGIO have worked on together went fine.  D.F. considers DIMAGGIO to be an excellent musician and an honest, open, and transparent person.

d.   DIMAGGIO at one point asked D.F. if he was interested in performing at a concert in Europe for $200,000. D.F. initially said he would.

e.   Nothing further developed from DIMAGGIO's initial offer to perform in Europe. D.F. never received an agreement, never signed a contract, and never received any money to perform at the event.  Other than the initial inquiry, D.F. never heard anything further about performing at the event.

f.   D.F. stated he communicated with DIMAGGIO using the DIMAGGIO EMAIL ACCOUNT.

24.  To date, neither K.D. nor the Foundation has received any funds from DIMAGGIO.

5.   K.D.'s Civil Lawsuit Against DIMAGGIO

25.  Based on my and FBI Special Agent Ryan Heaton's conversations with counsel to K.D. and the Foundation, I have learned that K.D., the Foundation, and K.D.'s company (which sent the $750,000 to DIMAGGIO), sued DIMAGGIO in or around December 2016 in California State Court.  Approximately nine months later, DIMAGGIO filed for Chapter 7 bankruptcy protection in United States Bankruptcy Court for the Central District of California.  K.D., the Foundation, and K.D.'s company filed claims in the bankruptcy proceeding and the Bankruptcy Court granted the motion for summary judgment filed by K.D., the Foundation, and K.D.'s company, specifically on their claims of

fraud and embezzlement.  The Bankruptcy Court awarded K.D., the Foundation, and K.D.'s company $1,161,604.65.

26.  During the state court litigation, DIMAGGIO sat for a deposition without counsel.[5]  DIMAGGIO testified under oath during this deposition.  Based on my review of the deposition transcript, DIMAGGIO made a variety of statements, including, but not limited to the following:

a.  DIMAGGIO testified that his neurologist recommended he not answer any questions based on his recent "memory problems."  DIMAGGIO nevertheless continued with the deposition.

b.  DIMAGGIO testified that B.S. sent emails from the DIMAGGIO EMAIL ACCOUNT.  DIMAGGIO stated this happened "all the time" in the entertainment business "[b]ecause sometimes people don't have time to write an email, and you delegate."  DIMAGGIO testified that virtually all of the emails with the Foundation were sent by B.S. using the DIMAGGIO EMAIL ACCOUNT.  Indeed, DIMAGGIO testified that an email sent from the DIMAGGIO EMAIL ACCOUNT to an email address belonging to B.S. which stated "Bruce let's contact him Monday", was sent by B.S.  DIMAGGIO admitted to sending approximately one email from the DIMAGGIO EMAIL ACCOUNT shown to him during the deposition.  DIMAGGIO testified he did not check his email.

_____

[5] Based on my conversations with counsel to K.D., the Foundation, and K.D.'s company, I understand that DIMAGGIO was represented by counsel earlier in the state court litigation. DIMAGGIO was represented by counsel during some portion of the bankruptcy litigation.

       c.   DIMAGGIO testified that B.S. was involved throughout the organization of the charity event.

       d.   DIMAGGIO testified that he was to be the "producer and musical director" for the charity and was not responsible for securing any artists for the charity event.

       e.   DIMAGGIO testified that B.S. and DIMAGGIO's accountant (who had since died according to DIMAGGIO) had access to DIMAGGIO's bank accounts and his debit card.  DIMAGGIO testified that he had no idea about the funds that came into the DMI Citibank Account.  DIMAGGIO stated that B.S. got over $600,000 in funds in connection with the charity concert. DIMAGGIO stated he did not recall any discussion regarding the need for the Foundation to transfer $750,000 to the DMI Citibank Account.

       f.   DIMAGGIO later testified that B.S. was supposed to receive $600,000 of the $750,000 in funds received.  I understand from counsel to K.D., the Foundation, and K.D.'s company that, during the course of the state court litigation, DIMAGGIO - through counsel - produced a check for $600,000 which DIMAGGIO claimed represented the funds taken by B.S. (with the authorization of DIMAGGIO) to pay the artists for the charity concert.  The check was dated July 14, 2016, which predated the Foundation's wire for $750,000.  Furthermore, I compared the $600,000 check produced by DIMAGGIO in the civil litigation (provided to the government by the Foundation's counsel) to bank records I received from Citibank.  Citibank produced a check with the exact same check number as the $600,000 check produced

by DIMAGGIO, however the check was for $10,000 and was written
to AEI Entertainment Brokerage Firm, a company connected to B.S.
Citibank records show another $2,500 written to B.S. that same
day.  When questioned about this during his deposition, DIMAGGIO
stated that B.S. was supposed to get the funds in August 2016,
after the wire from the Foundation.  DIMAGGIO denied producing a
forged document and stated that B.S. provided DIMAGGIO a copy of
the check which DIMAGGIO then provided to his attorney.

     g.   I understand from counsel to the Foundation,
K.D., and K.D.'s company that, also during the civil litigation,
DIMAGGIO, through counsel, produced a bank statement for the
Citibank account on which the $600,000 check cashed by B.S. was
purportedly drawn.  This bank statement showed the balance in
the account as of July 2016 as $715,662.41, sufficient to cover
a $600,000 check.  Based on my review of records received from
Citibank, I have learned that the balance in DIMAGGIO's account
as of July 2016 was $662.41.  DIMAGGIO denied forging the bank
statements and stated that he thought his "accountant and [B.S.]
were up to no good."  In the email in which the bank statement
was sent to counsel for K.D., the Foundation, and K.D.'s
company, which I have reviewed, DIMAGGIO's counsel stated
"Attached is the latest bank statement from Robin."

     h.   DIMAGGIO testified that he did give the $251,370
in funds, which was used to buy the house in Calabasas,
California, to his ex-wife as partial settlement of his spousal
support.  DIMAGGIO testified that he did so because his
accountant told him he had cash in his account.  In reviewing

the bank statements, DIMAGGIO admitted that the funds used to buy the house in Calabasas appeared to have come from the Foundation.

      i.   DIMAGGIO testified that on the morning of the deposition he received a call from someone previously associated with the Foundation.  During this telephone call, DIMAGGIO claimed this individual threatened DIMAGGIO.

      27.  Based on my review of a declaration filed in the state court litigation, a copy of which was provided to me by counsel to the Foundation, K.D., and K.D.'s company, I have learned the following:

      a.   During the course of the litigation, counsel to the Foundation, K.D., and K.D.'s counsel retained a GLAC (Global Information Certification) Certified Forensic Analyst and a Certified Information Systems Security Professional named Bruce Pixley ("Pixley").  Pixley was asked to examine some email authenticity issues and to conduct a proper search of DIMAGGIO's electronic devices for documents relevant to this case due to alleged discovery lapses of DIMAGGIO, using search terms and parameters agreed to by all parties.

      b.   On June 9, 2017, Pixley met with DIMAGGIO, DIMAGGIO's counsel, and counsel to the Foundation, K.D., and K.D.'s company to conduct an inspection of DIMAGGIO's laptop and cell phone.  At that inspection, however, DIMAGGIO claimed he did not own or use a laptop, but instead has an iMac desktop computer.  DIMAGGIO offered no explanation as to why he did not bring his iMac to the inspection, but offered to bring it to a

second inspection on June 12, 2017.  On June 10, 2017, DIMAGGIO canceled the second scheduled inspection.

        c.    During the June 9 inspection DIMAGGIO personally entered his password for the email account Pixley understood DIMAGGIO used for his communications with plaintiffs, thedimmagio@gmail.com[sic].[6]  Pixley downloaded and stored in DIMAGGIO's presence all electronic documents and data contained in that email account. Pixley applied the search terms previously agreed to and sent the results to counsel.

        d.    Based on the Pixley's review of the emails he did not find any documents responsive to the search terms.  He did not find any communications between DIMAGGIO and the Foundation, much less any metadata for the suspect emails.  He also found no communications with any music celebrity (or music celebrity representative) referenced in the First Amended Complaint or with whose name Pixley was familiar.

        e.    Pixley stated, however, that he was able to locate other emails going back to April 2016 in the email account.  Therefore, based on this fact and Pixley's review of hard copy emails between DIMAGGIO and the Foundation, which he could not locate in his forensic review, Pixley concluded that DIMAGGIO or another person with access to the email account must have selectively and intentionally deleted the emails.  Pixley

---

[6] Based on my conversations with counsel to K.D., K.D.'s counsel, and the Foundation, I understand there was an inadvertent typographical error in the declaration.  It stated thedimmagio@gmail.com, rather than thedimaggio@gmail.com

stated that he believed that, absent a separate retention, the deletion of the emails was permanent.

## C. DIMAGGIO's STATEMENTS REGARDING MOVING TO FRANCE

28. Based on my review of emails provided to me by the Foundation and K.D., I understand the following:

a.    On August 1, 2018, DIMAGGIO, using the DIMAGGIO EMAIL ADDRESS, sent an email to counsel to the Foundation, K.D., and K.D.'s company in which he stated "Told you both I wasn't winning this case early on however I wont be here as soon as this case is done and I pay my respect to the both of you before leaving back for Europe."

b.    On November 7, 2018, counsel to the Foundation, K.D., and K.D.'s company sent the Bankruptcy Court's order on the Motion for Summary Judgment to DIMAGGIO at the DIMAGGIO EMAIL ACCOUNT.  DIMAGGIO, using the DIMAGGIO EMAIL ACCOUNT, responded asking for counsel to summarize the order "in plain English."  Counsel provided that summary.  In response, DIMAGGIO, using the DIMAGGIO EMAIL ACCOUNT, stated "Thank you for explaining.  I'm moving finally to France Dec. 10th.  I'm done!"

c.    On December 4, 2018, DIMAGGIO, from the DIMAGGIO EMAIL ACCOUNT, told counsel to the Foundation, K.D., and K.D.'s company that DIMAGGIO was "finally in Paris."

29. I understand from counsel to counsel to the Foundation, K.D., and K.D.'s company as well as another individual who has claimed to be defrauded by DIMAGGIO that DIMAGGIO has claimed to be a French citizen on several

occasions.  To date, I have not been able to locate a flight by
DIMAGGIO departing the United States to France in November or
December of this year.

D.  **BACKGROUND ON E-MAIL AND SOCIAL MEDIA ACCOUNTS AND THE**
    **PROVIDER**

30.  In my training and experience, I have learned that
providers of e-mail and/or social media services offer a variety
of online services to the public.  Providers, like the PROVIDER,
allow subscribers to obtain accounts like the DIMAGGIO EMAIL
ACCOUNT.  Subscribers obtain an account by registering with the
provider.  During the registration process, providers generally
ask their subscribers to provide certain personal identifying
information when registering for an e-mail or social media
account.  Such information can include the subscriber's full
name, physical address, telephone numbers and other identifiers,
alternative e-mail addresses, and, for paying subscribers, means
and source of payment (including any credit or bank account
number).  Some providers also maintain a record of changes that
are made to the information provided in subscriber records, such
as to any other e-mail addresses or phone numbers supplied in
subscriber records.  In my training and experience, such
information may constitute evidence of the crimes under
investigation because the information can be used to identify
the user(s) of an account.

31.  Therefore, the computers of the PROVIDER are likely to
contain stored electronic communications and information
concerning subscribers and their use of the PROVIDER's services,

such as account access information, e-mail or message
transaction information, and account application information.
In my training and experience, such information may constitute
evidence of the crimes under investigation because the
information can be used to identify the user(s) of a SUBJECT
ACCOUNT.

        32.  In my training and experience, e-mail and social media
providers typically retain certain transactional information
about the creation and use of each account on their systems.
This information can include the date on which the account was
created, the length of service, records of login (i.e., session)
times and durations, the types of service utilized, the status
of the account (including whether the account is inactive or
closed), the methods used to connect to the account (such as
logging into the account via the provider's website), and other
log files that reflect usage of the account.  In addition, e-
mail and social media providers often have records of the
Internet Protocol ("IP") address used to register the account
and the IP addresses associated with particular logins to the
account.  Because every device that connects to the Internet
must use an IP address, IP address information can help to
identify which computers or other devices were used to access a
SUBJECT ACCOUNT.

        33.  In my training and experience, e-mail and social media
account users will sometimes communicate directly with the
service provider about issues relating to the account, such as
technical problems, billing inquiries, or complaints from other

users.  Providers of e-mails and social media services typically
retain records about such communications, including records of
contacts between the user and the provider's support services,
as well records of any actions taken by the provider or user as
a result of the communications.  In my training and experience,
such information may constitute evidence of the crimes under
investigation because the information can be used to identify
the user(s) of a SUBJECT ACCOUNT.

34.  I know from my training and experience that the
complete contents of an account may be important to establishing
the actual user who has dominion and control of that account at
a given time.  Accounts may be registered in false names or
screen names from anywhere in the world with little to no
verification by the service provider.  They may also be used by
multiple people.  Given the ease with which accounts may be
created under aliases, and the rarity with which law enforcement
has eyewitness testimony about a defendant's use of an account,
investigators often have to rely on circumstantial evidence to
show that an individual was the actual user of a particular
account.  Only by piecing together information contained in the
contents of an account may an investigator establish who the
actual user of an account was.  Often those pieces will come
from a time period before the account was used in the criminal
activity.  Limiting the scope of the search would, in some
instances, prevent the government from identifying the true user
of the account and, in other instances, may not provide a
defendant with sufficient information to identify other users of

the account.  Therefore, the contents of a given account,
including the e-mail addresses or account identifiers and
messages sent to that account, often provides important evidence
regarding the actual user's dominion and control of that
account.  For the purpose of searching for content demonstrating
the actual user(s) of a SUBJECT ACCOUNT, I am requesting a
warrant requiring the PROVIDER to turn over all information
associated with DIMAGGIO EMAIL ACCOUNT with the date restriction
of January 1, 2016 to the present, included in Attachment B for
review by the search team.

35.  Relatedly, the government must be allowed to determine
whether other individuals had access to DIMAGGIO EMAIL ACCOUNT.
If the government were constrained to review only a small
subsection of an account, that small subsection might give the
misleading impression that only a single user had access to the
account.

36.  I also know based on my training and experience that
criminals discussing their criminal activity may use slang,
short forms (abbreviated words or phrases such as "lol" to
express "laugh out loud"), or codewords (which require entire
strings or series of conversations to determine their true
meaning) when discussing their crimes.  They can also discuss
aspects of the crime without specifically mentioning the crime
involved.  In the electronic world, it is even possible to use
pictures, images and emoticons (images used to express a concept
or idea such as a happy face inserted into the content of a
message or the manipulation and combination of keys on the

computer keyboard to convey an idea, such as the use of a colon and parenthesis :) to convey a smile or agreement) to discuss matters.  "Keyword searches" would not account for any of these possibilities, so actual review of the contents of an account by law enforcement personnel with information regarding the identified criminal activity, subject to the search procedures set forth in Attachment B, is necessary to find all relevant evidence within the account.

37.  This application seeks a warrant to search all responsive records and information under the control of the PROVIDER, which is subject to the jurisdiction of this court, regardless of where the PROVIDER has chosen to store such information.

38.  As set forth in Attachment B, I am requesting a warrant that permits the search team to keep the original production from the PROVIDER, under seal, until the investigation is completed and, if a case is brought, that case is completed through disposition, trial, appeal, or collateral proceeding.

a.  I make that request because I believe it might be impossible for a provider to authenticate information taken from the DIMAGGIO EMAIL ACCOUNT as its business record without the original production to examine.  Even if the provider kept an original copy at the time of production (against which it could compare against the results of the search at the time of trial), the government cannot compel the provider to keep a copy for the entire pendency of the investigation and/or case.  If the

original production is destroyed, it may be impossible for the provider to examine a particular document found by the search team and confirm that it was a business record of the provider taken from the DIMAGGIO EMAIL ACCOUNT.

b.   I also know from my training and experience that many accounts are purged as part of the ordinary course of business by providers.   For example, if an account is not accessed within a specified time period, it -- and its contents -- may be deleted.   As a consequence, there is a risk that the only record of the contents of an account might be the production that a provider makes to the government, for example, if a defendant is incarcerated and does not (perhaps cannot) access his or her account.   Preserving evidence, therefore, would ensure that the government can satisfy its Brady obligations and give the defendant access to evidence that might be used in his or her defense.

## IV. REQUEST FOR NON-DISCLOSURE

39.  Pursuant to 18 U.S.C. § 2705(b), I request that the Court enter an order commanding the PROVIDER not to notify any person, including the subscriber(s) of the DIMAGGIO EMAIL ACCOUNT, of the existence of the warrant until further order of the Court, until written notice is provided by the United States Attorney's Office that nondisclosure is no longer required, or until one year from the date this warrant is signed by the magistrate judge or such later date as may be set by the Court upon application for an extension by the United States.   There is reason to believe that such notification will result in: (1)

flight from prosecution; (2) destruction of or tampering with evidence; (3) intimidation of potential witnesses; or (4) otherwise seriously jeopardizing the investigation.  The current investigation set forth above is not public, and based on the information gathered in this investigation, as set forth above, DIMAGGIO has previously stated he intended to leave the jurisdiction and appears to have deleted documents previously.

## IV.   CONCLUSION

40.   For all the reasons set forth above, I believe there is probable cause to believe that, DIMAGGIO committed wire fraud, in violation of 18 U.S.C. § 1343.  Specifically, beginning in or around May 2016 and continuing to the present, DIMAGGIO, knowingly and with intent to defraud, devised, participated in, and executed a scheme to defraud K.D. as to material matters and to obtain money and property from K.D. by means of material false and fraudulent pretenses, representations, and promises, and the concealment of material facts.  For the purpose of executing this scheme and in an essential part of the scheme, on or about August 5, 2016, in Los Angeles County, within the Central District of California, and elsewhere, DIMAGGIO transmitted and caused the transmission of a wire communication in interstate and foreign commerce to carry out an essential part of the scheme, namely, a wire of approximately $750,000 from a bank account in the name of K.D.'s company to an account controlled by DIMAGGIO, the DMI Citibank Account, in the Central District of California.

41.   Further, for all the reasons stated above, I believe there is probable cause to believe that the information associated with the DIMAGGIO EMAIL ACCOUNT constitutes evidence, contraband, fruits, or instrumentalities of criminal violations of Title 18, United States Code, Section 1343 (Wire Fraud), Title 18, United States Code, Section 1028A (Aggravated Identity Theft), and Title 18, United States Code, Section 1957 (Transactions in Criminally-Derived Proceeds).

/s/
_____

ROBERT CHOWTHI
Special Agent
Federal Bureau of Investigation

Subscribed to and sworn before
me on December ___, 2018.

CHARLES F. EICK
_____
UNITED STATES MAGISTRATE JUDGE